1    Grant T. Engrav, OSB No. 133517
     Engrav Law Office, LLP
2    1500 SW 1st Ave, Suite 1170
     Portland, OR 97201
3    Email: grantengrav@engravlawoffice.com
     Phone: (971) 339-2737
4
     *Counsel for Plaintiff*
5

6

7                    UNITED STATES DISTRICT COURT

8                        DISTRICT OF OREGON

9                        PORTLAND DIVISION

10                                        )    Case No.  3:22-cv-00903-YY
      VERITAS ALLIES LLC, an Oregon       )
11    Limited Liability Company,          )    PLAINTIFF'S RESPONSE TO
                                          )    DEFENDANT'S MOTION FOR
12                    Plaintiff,          )    SUMMARY JUDGMENT
                                          )
13            v.                          )
                                          )
14    CYNTHIA FREE; an individual; and    )
      HEATHER SCHIAPPACASSE, an           )
15    individual,                         )
                                          )
16    _____)
                                          )
17                    Defendants.         )
                                          )
18

19    I.      INTRODUCTION

20            The parties held a one-hour hearing on personal jurisdiction in front of the Honorable

21    Judge Plank, who ruled against Defendant from the bench.  Defendant now brings a substantially

22    similar motion, without offering any new, material evidence, cases, or context.  What makes the

23    decision to take second swing more confusing is that the deposition of Defendant has now taken

Page 1 – PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1  place and her testimony established Defendant's numerous uses of Oregon residents, Oregon

2  tools, and Oregon targets that give rise to the present action.  To name a few, Defendant made

3  hundreds of calls to Ms. Free, an Oregon resident and located in Oregon for all relevant conduct

4  to coordinate on their conspiracy to, as Defendant put it in her text message to MS. Free, ""…

5  get him out of the industry once and for all. I have enough power to where people will listen to

6  me. What did you mean by that?"  Defendant also contacted and coordinated with another

7  Oregon resident Jean Gordon for the same purpose, generating over fifty pages of text messages.

8  The evidence will show Defendant only started communicating with Ms. Free and Ms. Gordon

9  after the SIIA conference and that there was no purpose to her communications with the two

10  other than to "destroy" Mr. Vizzini and his companies.

11        Defendant targeted the Oregon Secretary of State for one outlet of her attack.  She

12  targeted Veritas' clients and talked with its employees.  Finally, and with evidence that wasn't

13  even before Judge Plank, Defendant negotiated and executed a contract with Veritas on behalf of

14  her consulting business, referred Veritas clients, introduced its executives to clients, considered

15  investing $100,000 and being offered employment with the company.

16        This was a long introduction… but it could be longer because the evidence supporting

17  jurisdiction and damages is plentiful and, therefore, the motions should be denied.

18

19    II.    SUMMARY OF THE UNDISPUTED FACTS

20        The following is an overview of the undisputed facts of the case.  **Sections A, B, and C**

21    **are entirely supported from citations to Defendant's deposition and Defendant's text**

22    **messages, so they truly are undisputed facts.**  The only exception to this is the reference to the

23

1    Marketing Agreement which is a contract signed between the parties and also admitted to in

2    Defendant's deposition testimony.

3       A.  While attending conferences on behalf of Veritas and its subsidiaries, Mr. Vizzini and
      Defendant met as early as 2017 and over time had frequent communications as potential
4          business partners and that lead to Defendant negotiating and entering into one contract with
      Veritas' subsidiary and Defendant almost investing $100,000 in the business, and
5          Defendant being offered a job offer.

6    Defendant and Mr. Vizzini first met at a health care conference and have known each other

7    since 2017. (HS Dep. Tr. at 36: 16-25, to 37: 1-11)  Defendant and Mr. Vizzini started discussing

8    business as early as 2017 or 2018.  (HS Dep. Tr. at 36: 16-25, to 37: 1-11).  According to

9    Defendant, Mr. Vizzini would encourage the two to do business together and Defendant would

10    request information from Mr. Vizzini.  (HS Dep. Tr. at 36: 16-25, to 37: 1-11).  Starting in 2019,

11    they communicated monthly and merged business and personal affairs in various ways. (HS Dep.

12    Tr. at 78: 19-23).  Defendant entered into a marketing agreement with Veritas, referring work to

13    them, and also made referrals to David Vizzini's business, Veritas. (HS Dep. Tr. at 24: 1-11).  As

14    Defendant puts it, "David asked me to make introductions for him. And I did". (HS Dep. Tr. at 24:

15    1-11).  She introduced Veritas' president and Mr. Vizzini to potential customers at the SIIA

16    conference. (HS Dep. Tr. at 42: 2-12).  The production record generated 235 pages of text messages

17    between Mr. Vizzini and Defendant. **Declaration of Engrav.**

18    Defendant conducted a business meeting with the Veritas executive team at the SIIA

19    conference in October of 2021.  (HS Dep. Tr. at 40: 15-20).  Present at the meeting was Defendant,

20    Josh Bailer an executive with Veritas and also Mr. Vizzini, it's CEO and majority owner.  *Id.*

21    Defendant and Mr. Vizzini discussed business, including Veritas' financial condition and payroll,

22    and Defendant considered investing $100,000 to help with payroll but ultimately did not invest.

23    She did offer to provide structure and internal growth assistance. (HS Dep. Tr. at 59: 16-25, to 60:

1      1-5).  They had multiple conversations pertaining to her potential investment in the business,

2      estimating the conversation lasted 1.5 hours. (HS Dep. Tr. at 29: 15-25, to 30 1-5).  At the

3      conclusion of the meeting, Defendant told Mr. Vizzini,  Defendant ultimately did not invest in

4      Veritas. (HS Dep. Tr. at 29: 15-25, to 30 1-5).  However, Defendant informed Mr. Vizzini, "I told

5      him that if he needed help with his business, I would help him provide structure and help him grow

6      internally…" (HS Dep. Tr. at 29: 15-25, to 30: 1-5).

7              In 2019, Defendant negotiated an agreement with Equitas DX (Ex. 1).  The Agreement was

8      executed by Defendant's business partner.  *Id*.  The Agreement provides Oregon as the venue and

9      law source.  *Id*.  At her deposition, Defendant demonstrated knowledge of intimate business

10     functions of Veritas, discussing Veritas' propensity to do business with TPAs, pharmacy benefit

11     managers, and discussing why they would be a good fit for Veritas's business because Veritas uses

12     reference-based pricing mechanisms that he could sell to the TPAs and other listed entities. (HS

13     Dep. Tr. at 41: 15-20).  Under the Agreement, if Defendant's clients asked for RBP services and

14     used Veritas (via its subsidiary Equitas)' services, her business would get a fee.  (HS Dep. Tr. at

15     49: 5-22).

16             Defendant distinguished between two different business conversations she was having with

17     Veritas.  She explains there was both the "rolodex idea" where clients were accumulated and

18     referred out, and also the marketing agreement.  (HS Dep. Tr. at 51: 22-25, to 52: 1-16).Had the

19     meeting between Veritas and Defendant moved forward, it would have resulted in another

20     marketing agreement between her and Mr. Vizzini's companies. *Id.*

21             Defendant conducted a business meeting with the Veritas executive team at the SIIA

22     conference, providing a list of potential clients she felt would be a good fit for their business and

23     physically introducing them to Veritas. (HS Dep. Tr. at 42: 2-12). The Defendant then physically

Page 4 – PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    introduced the clients to Veritas. (HS Dep. Tr. at 42: 2-12).    These introductions happened at the

2    SIIA Conference. (HS Dep. Tr. at 42: 2-12). Some of the clients that were introduced by Defendant

3    were $60mm businesses.  *Id.*   She also had a meeting with the Veritas Allies team to evaluate HC

4    Consulting company doing business with Veritas and was presented with financial numbers,

5    concluding that Veritas' financial condition was not satisfactory. Defendant negotiated with both

6    Veritas and directly with its subsidiary Equitas:

7           Q. Okay. So what -- what would -- can you help me understand the difference
            between that marketing agreement and this Rolodex concept that you just
8           mentioned?
            A. We didn't use Equitas because we didn't believe in the product. We didn't like
9           the product. And we have -- we reserve the right to work with who we  want to
            work with. I told David that multiple times over -- from 2019. David knew that we
10          weren't going to  do -- if he couldn't produce something viable that I could push out
            into the market, I wasn't going to do business with him, period.
11          Q. So you just mentioned 2019. So you and Mr. Vizzini were discussing doing
            business as far back as 2019?
12          A. For Equitas.
            Q. An And then later in 2021, Veritas. Is that right?
13          A. Possibility. Yeah, it was a possibility. (HS Dep. Tr. at 50: 8-25, to 51: 1).

14   Defendant made multiple phone calls with David Vizzini and Veritas staff while he was located in

15   Oregon.  After they both attended a conference prior to October 1st, 2021, Defendant engaged in a

16   telephone call with Mr. Vizzini and his executive assistant Sherri Freeman. (HS Dep. Tr. at 34:

17   12-21).  Around 2019 to 2020 Mr. Vizzini and Defendant also discussed employment, and Mr.

18   Vizzini made an employment offer to Defendant. (HS Dep. Tr. at 81: 9-22).

19         B.  Defendant initiated numerous phone calls with numerous Oregon residents to execute her
               plan of "destroying Veritas"
20
                       i.  *Defendant's solicitations and conspiracy with Oregon resident Ms. Free.*
21
                 After Defendant and Mr. Vizzini broke up, she called his ex-wife Ms. Free. (HS Dep. Tr.
22
     at 72: 2-14). They did not know each other prior to the breakup. (HS Dep. Tr. at 72: 2-14). They
23

became, "friends". (HS Dep. Tr. at 72: 2-14). That friendship formed a couple of months prior to Ms. Free speaking to Defendant about taking down the S.O.S. Registration. (HS Dep. Tr. at 72: 2-14). Defendant and Ms. Free, who is still located in the state of Oregon, still talk to this day. (HS Dep. Tr. at 129: 20-25, to 130: 1-4). From the time period of shortly after the conference and continuing, Defendant describes the frequency of their conversations as, "Possibly. I mean, we talked a lot on the phone. I mean, Cindy and I spent a lot of time on the phone talking to each other." (HS Dep. Tr. at 129: 20-25, to 130: 1-4). After the conference, and during the time Defendant was promising to damage Veritas, Defendant made "hundreds of phone calls" with Ms. Free, who Defendant understood to be in Oregon. Defendant purchased a plane ticket to Oregon in the midst of these conversations. (HS Dep. Tr. at 167: 21-25, to 168: 1-7). Defendant sent multiple messages concerning her flight details (Ex. 2 at 24-28). Defendants' plan was to meet with Ms. Free and also with Mr. Vizzini's former partner Jean Gordon (HS Dep. Tr. at 167: 21-25, to 168: 1-7). At the same time, Defendant invited her best friend Kim Sharbatz, to travel from Michigan to join them. (HS Dep. Tr. at 168: 22-25, to 169: 1-25 to 170: 1-25). Ms. Sharbatz is a VP of marketing at Blue Cross, another entity in the health care industry, along with Defendant and Veritas. *Id.*

Defendant was dishonest in her deposition about her communications with Ms. Free pertaining to the take down of the S.O.S. Registration.

Q. Did you assist Ms. Free in the registration with the Secretary of State?
A. No.
Q. Did you consult with her about it?
A. No.
Q. Did you discuss how to do it and why to do it with her?
A. No.
Q. Were you aware that it would have a negative impact on Veritas Allies, LLC?
A. I didn't know she was going to do it. (HS Dep. Tr. at 73: 13-23)

In contrast to that testimony, Defendant and Ms. Free discussed Veritas and its subsidiaries secretary of state registration as early as October 7th, 2021. (Ex. 2, at 7). They had multiple phone calls between this point and the ultimate takeover of the Veritas Allies name. (Ex. 2 at 1-20). Defendant asked Ms. Free, "How do we secure the Veritas Allies name Nationally." (Ex. 2 at 24). When Ms. Free went through with the idea, Defendant stated via text, "He's going to FREAK the fuck out" and then added later, "He deserves it". She states, "No one will touch him after this business fails." Shortly after that message, Defendant writes, "Who was that guy at 6 degrees you wanted me to talk to? Scott?" (HS Dep. Tr. at 155: 3-10). Six Degrees is a former employer of Mr. Vizzini and an Oregon company. (Dec. of Engrav). Defendant also invited her friend, a BP of Marketing at Blue Cross (another company in the same industry as Veritas and Defendant) to "collaborate on VA". (Ex. 2 at 30). This individual was later invited to Portland to join Ms. Free and Defendant. *Id.* In addition, Defendant recommend to Ms. Free that they involve Defendant's friend who works as a producer at fox news to "Blow this…up". (Ex. 2 at 31). Plaintiff's case will demonstrate that this conspiracy orchestrated by Defendant and Ms. Free was all to maximize the amount of harm on Veritas.

Defendant also was in constant communication with Ms. Free after she received a demand letter from Veritas in regard to the SOS registration. " (Ex. 2 at 35-36). In response to the demand letter, Defendant told Ms. Free, "I wouldn't dissolve it. Keep it. It will drive him crazy" (Ex. 2 at 36). She later told Ms. Free, "But his wasn't filed. No one in Oregon was using it when you filed it. IT was dissolved. You should talk to your attorney about it AND if they say ok, get it trademarked ASAP then he can NEVER use it" (Ex 2 at 37) . Defendant also texted Ms. Free after she had sent a link to the SOS cite and said, "Call them tomorrow and see if you can transfer, I'll pay your fee." Then later she added, "you dissolved it and I grabbed the name." (Ex. 2 at 39).

1    She wanted Ms. Free to transfer it to her, and said, "How can we transfer or do I just go register it

2    before he does again?"  (*Id. at* 40).

3        On October 8th, 2021, Defendant recommend to Ms. Free that they report Mr. Vizzini to

4    the IRS, despite having no tax documents or any information whatsoever supporting IRS

5    misrepresentation.  (Ex. 2 at 16).  On November 4th, 2021, Defendant also invites Ms. Free to

6    HCAA, another healthcare conference, which Ms. Free has no business being at except for the

7    conspiracy between the two. (Ex. 2 page 34).

8                    ii.  *Defendant engaged in an absurd amount of text messages and outreaches*
                        *to Mr. Vizzini's former romantic partner, Jean Gordon.*
9

        On October 8th, 2021, Defendant spoke to Ms. Gordon for an hour on the phone.  (Ex. 2 at
10
     16).  Moreover, Defendant compulsively texted Ms. Gordon in a blatant attempt to manipulate Ms.
11
     Gordon to Defendant's position.  (Ex. 15.)  Within a few months of the SIIA conference, Defendant
12
     had generated over fifty pages of text messages with Ms. Gordon.  *Id.*
13
        C.  Defendant specifically targeted Veritas customers and contacted them with the express
14            purpose of ruining Veritas.

15        Defendant admitted to sending a text message where she said, "I reached out to all of my

16    people who know him, and he's going to definitely feel that pressure business-wise." (HS Dep. Tr.

17    at 134: 1-25 to 135: 1-5).

18                    Q. Right here you say: I'm going to **get him out of the industry once and for all.**
                        I have enough power to where people will listen to me. What did you mean by that?
19                    A. You know, it's just girl talk, you know, as far as that goes. We were just, you
                        know, talking about how bad David treats people and women, and that was just us
20                    letting off some steam. I think they call it, like, locker room talk.
                        Q. That's all that was?
21                    A. Correct.  (HS Dep. Tr. at 160: 10-25) (*emphasis added*)

22

23

Page 8 – PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    Defendant told Ms. Free that's what she was doing.  "No one can identify any of his clients

2    outside of Mary Beth…   My friends' company has a contract out with him, but he [the friend]

3    hasn't signed it." (Ex. 2 at 38) (*context added*).

4    On October 7th, 2021, Defendant pasted a text message to Ms. Free, that she had previously

5    sent Mr. Vizzini,  It reads:

6    God, I'm so bummed you couldn't be at this dinner tonight!!! Talk about a power
     couple and literally ruling the world.  I just closed single handily closed two of the
7    biggest deals of my life and NOW… I have to take 6 Degrees in because you are a
     sociopathic narcissist – of course if you would have been more up front about it,
8    we could have worked together on it… But thankfully, I'm just as diabolical &
     sociopathic as you – but, I've learned that I need a little ebit of insight & empathy
9    which allows me to contain my sociopathic tendencies.  THANK GOD for maslows
     NOW (Ex. 2 at 11).

10

11   The record demonstrates that Defendant then made good on her threat and did target 6

12   Degrees Health LLC.  On October 9th, 2021, Defendant sends a message to Ms. Free saying, "Who

13   was the guy at 6degrees you wanted me to talk to? Scott."  (Veritas Exhibit 2 Page 20).  There is

14   no responsive text message, and Plaintiff will demonstrate at trial that the parties discussed such

15   details on the phone in-between messages.

16   Q. All right. So you sent this to Mr. Vizzini's ex-wife. What did you mean
     by "power couple"?
17   A. Well, that's what David called us. He called us a power couple. You
     know, we had a Dallas location and a Portland location, and the two of us
18   together were going to be able to run the industry.
     Q. like a partnership concept?
19   A. No. He called us a power couple because he wanted to spend half of his
     time in Dallas with me and he wanted me to spend half of my time in
20   Portland with him.
     Q. And you reference two of the biggest deals of your life. What clients
21   were those with?
     A. I don't think that matters because he wasn't involved in any of those, and
22   Veritas was never even a -- a discussion on that, so -- and they didn't happen
     in Oregon.
23   Q. I stand by the question. I'm going to ask you to answer the question.
     A. I don't remember.

Page 9 – PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1     Q. You don't remember the two biggest deals of your life?
     A. I don't.
2     Q. I just want to make this as clear as possible. These are the two biggest deals of
     your life. And this is 2021, and some time's passed. And you don't recall these
3     clients at all?
     A. I don't.
4     (HS Dep. Tr. at 143: 1-25)

5   *D. Damages*

6     For the purposes of this motion for summary judgment, Plaintiff is putting forward four

7 categories of damages:

8       *i. Veritas incurred costs via remedying the SOS Filing that Defendant helped*
        *take from Veritas Allies.*
9

10    Ex. 3 demonstrates that Veritas incurred $250 in making multiple filings with the SOS as

11 a result of Defendants' conspiracy to acquire the registration.  This amount is more than Veritas

12 would have incurred if it were only required to renew.

13       *ii. Loss of the Leading Edge Administrators Contract*

14    Leading Edge Administrators signed a contract with Veritas Allies on or about September

15 22nd, 2020.  On October 10, 2021, Defendant says, "Tom Cardwell & John Hennessy want to chat

16 with me." (Ex. 2 at 21).  Mr. Cardwell was Veritas' point of contact and a decision maker at

17 Leading Edge Administrators.  (Declaration of Barnes).  Defendant and Mr. Cardwell were also

18 friends and had known each other for over about 10 years. (HS Dep. Tr. at 157: 5-22).  Shortly

19 after the above text message, Defendant provides:

20     "I'm going to get him out of the industry once and for all"
     "I have enough power to where ppl will listen to me"
21     (Ex. 2 at 22).

22    Then on November 24th, 2021, Defendant provides, "Tom [Cardwell] is pulling 10k lives."

23 (Ex. 2 at 42).  The significance of this statement requires some industry context.  Referenced Base

1    Pricing companies such as Veritas will obtain work and bill clients on a Per Member Per Month

2    basis. (Ex. 10 and 13).  The amount of members is also referred to as the number of lives. *Id.*

3    Therefore, when Defendant says Mr. Cardwell is pulling 10k lives, she is saying that Leading Edge

4    Administrators is taking away 10,000 members per month from Veritas revenue stream. *Id.*  Then,

5    shortly after Defendant tells Ms. Free of this pending move, it becomes reality. *(Ex 4 and 5.)*

6    Leading Edge ultimately terminated its entire business relationship with Veritas on or around

7    March of 2022, just three months after Defendant's message to Ms. Free. *Id.*

8         **Ex. 1** is a copy of the Agreement between Leading Edge Administrators and Veritas. **Ex.**

9    **6** is financial information of Veritas demonstrating revenue from Leading Edge Administrators

10    prior to Defendant's successful efforts to have Leading Edge Administrators affect their business

11    relationship with Veritas.

12              *iii.  Lost revenue from Diversified Benefits Administrators ("DBA") due to
              Defendant's conduct.*
13

14         Ms. Donalson is the President of DBA.  (Ex. 11)**.**  She has been a long-time customer of

15    Veritas.  Ms. Donalson states that Defendant made attempts to prevent potential customers from

16    meeting with Veritas, that she spoke maliciously about the company out of spite, and that she made

17    statements to Ms. Donalson that caused her to question her relationship with Veritas which cost

18    Veritas approximately $175,000 to $225,000. *Id.*

19         E.  Plaintiff has raised discovery issues with Defendant, and although Defendant feels that it
             has provided more than sufficient evidence in this MSJ Response, Plaintiff's Production
20           deficiencies are subject to reasonable delays from Plaintiff's counsel's office, and Plaintiff
             reserves the right to supplement evidence to support this response pending additional
21           production.

22         Supporting the declaration of Grant Engrav, is Exhibit 7, which is a true and correct copy

23    of email correspondence with opposing counsel.  Counsel for Defendant has had reasonable, and

1    material complications at its law firm, which have delayed production. At Defendant's testimony,

2    several documents were identified that were not produced. Counsel for Plaintiff corresponded

3    with counsel for Defendant on this issue, but the matter has not been resolved yet. In the event

4    that relevant production occurs following submission of this Response, Plaintiff's position is that

5    Plaintiff is permitted to supplement exhibits to support its Response.

6

7    III.     LAW AND ARGUMENT

8

9    A. Summary Judgment Standard

10           Summary judgment is appropriate when "the movant shows that there are no genuine

11   disputes of material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

12   Civ. P. 56(a). The movant has the burden of demonstrating the absence of questions of material

13   fact for trial concerning any elements of the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

14   256 (1986). A material fact is genuinely in dispute if "the evidence is such that a reasonable jury

15   could return a verdict for the non-moving party." *Id.* at 248. The court must examine the record as

16   a whole and make reasonable inferences about the facts in favor of the nonmovant. *Tolan v. Cotton*,

17   134 S. Ct. 1861, 1866 (2014); *Scott v. Harris*, 550 U.S. 372, 378-80 (2007). A court may grant

18   judgment to a party on all or part of a claim. Fed. R. Civ. P. 56(a); *see, e.g. Wang Labs, Inc. v.*

19   *Mitsubishi Elecs*. Am., Inc., 860 F. Supp. 1448, 1450 (C.D. Cal. 1993).

20   B. Organization of Argument

21           As a preliminary matter Defendant enumerates its motion numbers differently in different

22   parts of its memo—happens to the best of us—and this paragraph is simply to get everyone on the

23   same page. On page two of its motion, Defendant identifies its motions as 1) related to personal

1    jurisdiction, 2) related to damages, and 3) related to personal jurisdiction.  However, the body of

2    the motion has Motions 1 and 2 relating to personal jurisdiction, which makes more sense as the

3    two issues are related.  Therefore, this Response will identify and treat Motions 1 and 2 as

4    pertaining to the personal jurisdiction issues raised by Plaintiff.

5        C.  Personal Jurisdiction is Proper in Oregon for both claims.

6        Plaintiff accepts Defendant's outline of the three-prong test used by the 9th Circuit.  The

7    cases it cites are on-point as well—albeit some more than others.  Defendant cites to *Walden* v.

8    *Fiore*, which is on point, however, is a cornucopia of provisions of rulings that benefit Veritas.

9    571, US 277 (2014).  *Walden* provides*, "*And although physical presence in the forum is not a

10   prerequisite to jurisdiction, physical entry into the State — either by the defendant in person or

11   through an agent, goods, mail, or some other means — is certainly a relevant contact. *Walden v.*

12   *Fiore*, 571 US 277, 285, 134 S Ct 1115, 1122, 188 LEd2d 12, 21 (2014) (Internal Citations

13   omitted).  *Walden* provided a through analysis of the *Calder v. Jones* case, which is directly on

14   point because the claims at issue were tort based.  *Calder v. Jones*, 465 US 783, 104 S Ct 1482, 79

15   LEd2d 804 (1984).

16       *Walden* provides the following summary of Calder, "California actress brought a libel suit

17   in California state court against a reporter and an editor, both of whom worked for the National

18   Enquirer at its headquarters in Florida. The plaintiff's libel claims were based on an article written

19   and edited by the defendants in Florida for publication in the National Enquirer, a national weekly

20   newspaper with a California circulation of roughly 600,000" *Walden v. Fiore*, 571 US 277, 286-

21   87  (2014).  Walden held California's personal jurisdiction was consistent with due process and

22   found, "those forum contacts  to be ample: The defendants relied on phone calls to "California

23   sources" for the information in their article; they wrote the story about the plaintiff's activities in

1    California; they caused reputational injury in California by writing an allegedly libelous article

2    that was widely circulated in the State; and the "brunt" of that injury was suffered by the plaintiff

3    in that State. *Id. at* 287.  In this case, Defendant's actions are similarly calculated and targeted into

4    Oregon, specifically her many calls to Cynthia Free (Ex. 2 and 8), Jean Gordon (Ex. 15), David

5    Vizzini, other Veritas Staff (Ex. 8), her coordination with altering the Oregon Secretary of State

6    Business Registration (Ex. 8), business contract with Veritas (Ex.1), and targeting former

7    employers of David Vizzini could hardly be more tailored towards the state she now objects to

8    hosting the court consequences backstopping her tortious actions.[1]

9         The Supreme Court found the "crux" of Calder was the reputation-based effects of the

10    alleged libel.  *Id. at* 287.  The present claims have a similar dynamic to Calder, but the nature of

11    an intentional interference claim also must contemplate the tools that the Defendant used to bring

12    about the harmful interference, and her target's location.  Nearly all of the tools, all outlined above,

13    were Oregon based as was her target, Veritas and David Vizzini.

14         Argument on the application of the undisputed facts to the three-prong test follows:

15    

16    i.    *First prong, "The defendant must purposefully direct [her] activities or consummate*
       *some transaction with the forum or resident thereof; or perform some at by which*

17       *[her] purposefully assails himself of the privilege of conducting activities in the*
       *forum, thereby invoking the benefits and protections if its laws."  Schwarzenegger v.*

18       *Fred Martin Motor Co., 374 F3d 797, 802 (9th Cir 2004).*

19         The defendant purposefully directed her activities towards Oregon.  Defendant's target was

20    Mr. Vizzini and his companies, namely Plaintiff Veritas Allies.  Defendant sent the following text

21    messages to Ms. Free (who is an Oregon resident and was residing in Oregon at all times) making

22    clear her intentions and her target:

23    _____

[1] The facts surrounding these factual positions are outlined in detail in the factual summary section of them brief.

- "I'm going to ruin Mr. Vizzini' s business" (HS Dep. Tr. at 113, 14-25 to 114, 1-2)
- "I'm going to get him out of the industry once and for all. I have enough power to where people will listen to me. What did you mean by that?" (HS Dep. Tr. at 160: 10-25)
- "I reached out to all of my people who know him, and he's going to definitely feel that pressure business-wise." (HS Dep. Tr. at 134: 1-25 to 135: 1-5).
- "I'm putting him to bed now, I'm sure he'll resurface at some point". (Ex. 2 at 6.)
- "I think we should call the IRS on him". (Ex. 2 at 16).
- "No one will touch him after his business fails" (Ex. 2 at 19).

The above clearly demonstrates her motive and target were to ruin Mr. Vizzini's business Veritas, both he and the company are Oregon based. So like the *Calder* case, she was trying to achieve a result in the specific territory of Oregon. But the target of her actions isn't the only aspect of how Defendant purposefully director her activities towards Oregon. She made outreaches to Oregon individuals Cindy free and Jean Gordon to assist her in her mission, just as the journalists in *Calder* called witnesses in California. (Ex. 2 and Ex. 15.) She coordinated with Ms. Free on the take over of Plaintiff's Oregon Secretary of State business Registration. The communication and coordination with MS. Free was compulsive and unhinged. She estimates hundreds of calls to Ms. Free, who she "became friends with" shortly after the SIIA conference. (HS Dep. Tr. at 156: 1-22). A review of their text messages indicates they went to sleep discussing the demise of Mr. Vizzini and his company and woke up doing the same without missing a beat. She bought a plane ticket to come Portland, although the trip was cancelled last minute. (HS. Dep. Tr. 20, 8-22.) She invited her colleagues and friends to come to Portland, Oregon to assist. (HS Dep. Tr. at 168: 22-25, to 169: 1-25 to 170: 1-25). She contacted Mr. Vizzini's previous, Oregon employers. (Ex. 2 at 30).

Alternatively, she "consummated a transaction." She was in perpetual business conversations with Veritas, with one deal being executed and one deal being negotiated but falling apart right towards the point her retaliation commenced. Ex. 1, and (HS. Dep. Tr. at 20, 8-22.)

1    Defendant also heavily discussed business with Mr. Vizzini, and came close to investing $100,000

2    in the company. (HS. Depo 59, 16-25). That transaction did not consummate, however, she did

3    refer Veritas clients and make introductions to the business. *Id at* 23, 2-6.

4        ii.    *Second prong: The claim must be one which arises out of or relates to the defendant's forum related activities[2]; and*

5

6           The only claim at issue is intentional interference with economic relations—there are two counts. The Oregon Uniform Civil Jury Instruction provides the elements as follows:

7        The plaintiff had a [contract / professional or business relationship / prospective economic relationship / prospective inheritance]; (2) The defendant was not a

8        party to the [contract / professional or business relationship / prospective economic relationship / prospective inheritance]; (3) The defendant intended to

9        interfere with the [contract / professional or business relationship / prospective economic relationship / prospective inheritance]; (4) The defendant interfered

10       through improper means or for an improper purpose in one or more of the ways alleged by the plaintiff; (5) The defendant's interference caused harm to the

11       [contract / professional or business relationship / prospective economic relationship / prospective inheritance]; and (6) The defendant's interference

12       resulted in damages to the plaintiff.
         UCJI 40.03, *citing Babick v. Oregon Arena Corp., 333 Or 401, 410–11, 40 P3d*

13       *1059 (2002); McGanty v. Staudenraus, 321 Or 532, 545–51, 901 P2d 841 (1995).*

14

15          Plaintiff relies on the same facts argued under prong one, to incorporate and support and

16   its position under prong two. The elements of the claim are provided in full because it's clear that

17   the fundamental nature of this claim has to do with the plaintiff's contracts, which was the target

18   of most of Defendant's interference. Intent is also an element, and Defendant's many smoking gun

19   statements provided under the first prong demonstrate her intent was targeted towards an Oregon

20   man and an Oregon company. The fourth element involves improper means, and both Defendant's

21   actions with the S.O.S and using Ms. Free and Ms. Gordon and phone calls into the state were

22

23   _____

    [2] *Id.*

1    tailored around Oregon as the forum.  Finally, the harm is clearly local, as Veritas is here and the

2    damages befell them here—particularly relating to the S.O.S. registration.

3         *iii.*      *Prong three: The exercise of jurisdiction must comport with fair play and substance*
            *justice, i.e. it must be reasonable.[3]*

4

5           If a person calls an Oregon resident and uses them to assist in directing my arrow towards

6    another Oregon resident, and that person hits that Oregon resident, does it make any sense for that

7    person to be surprised they are being sued in Oregon?  They may point out that they haven't gone

8    into Oregon, but… their arrow has.  In fact it hit its target, which here, is an Oregon target.  Plaintiff

9    has offered copious evidence of Defendant's intent—so didn't Defendant get exactly what she

wanted?  So why the surprise and where is the unfairness to Defenadnt?

10           Another case establishes this common sense principal,. In *State ex rel. Advanced Dictating*

11    *Supply, Inc. v. Dale*, In *State ex rel. Advanced Dictating Supply, Inc. v. Dale* the Oregon Supreme

12    Court upheld jurisdiction over a nonresident defendant in a defamation action against the

13    contention that there was no local act. 269 Or 242, 246–47, 524 P2d 1404 (1974). The Court held

14    that when a defendant, located outside the State of Oregon, knowingly sends a false statement into

15    Oregon, intending that it should be relied on to the injury of a resident of the Oregon, the defendant,

16    for jurisdictional purposes, has acted within the State of Oregon. The present case is similar, and

17    although much of the personal jurisdiction case law in the state has to do with widgets or tort

18    assaults, the fundamentals of the Dale case are the fundamentals of this case. As alleged, Defendant

19    acted with intent that her statements would make their impact in Oregon, upon Veritas. She also

20    coordinated her efforts for co-conspirators towards Ms. Free and Ms. Gordon, and the subject of

21    her vendetta was an Oregonian.

22

23    _____
[3] *Id.*

1    Moreover, on the subject of substantial justice, Defendant's consulting business executed

2    its contract with Veritas and elected an Oregon form and choice of law provision.  That directly

3    demonstrates the lack of a burden because Defendant has made such a choice in the past.

4    The Court should deny the Defendant's motions pertaining to personal jurisdiction because

5    her actions, tools, and targets were all Oregon based, and she already lost in state Court on the

6    issue and the evidence against her as only gotten more substantial in favor of personal jurisdiction

7    in Oregon.

8    D.  Defendant moves against damages, but the record supports plenty and the motion should
     be denied.

9

10           i.    *Damages pertaining to Plaintiff's First Cause of Action.*

11    For the purposes of this motion against Plaintiff's first cause of action, Plaintiff puts

12    forward four categories of damages.  The undisputed facts section outlines 1) the declaration of

13    Mary Beth Donaldson, owner of Diversified Benefits Administrator supporting Veritas' claim that

14    Defendant's actions caused Plaintiff to lose significant portions of her business, 2) the Leading

15    Edge Administrators contract and termination letter, the financial invoices pertaining to the loss of

16    the leading edge contract, 3) the financial damages incurred via the secretary of state filings, and

17    4) the labor and payroll costs incurred by Veritas in dealing with the S.O.S. registration.

18    1.  Diversified Benefits Administrators

19    Ms. Donaldson's declaration provides direct testimony from a Veritas customer that

20    Defendant did exactly what Veritas claims.  Ms. Donaldson's testimony supports Veritas position

21    that Defendant reached out to customers and targeted David Vizzini' s businesses and made

22    representations about the company aimed to deprive Veritas of business.  (Ex. 11 at ¶ 1,2,3) Ms.

23    Donaldson has also provided a range of revenue she diverted from Veritas in response to the

1    allegations. (Ex. 11 at ¶ 5). Ms. Donaldsons' declaration speaks for itself and is directly supportive

2    of Veritas' position.

3        2.  Leading Edge Administrators

4            As outlined in the statement of facts section, Defendant texted Ms. Free that she talked

5    with her longtime friend Tom Cardwell, and she said that Mr. Cardwell indicated he was going to

6    drop his business with Veritas by 10,000 lives. ((HS Dep. Tr. at 157: 5-22 and Ex 2. Ex. 13 at ¶4,

7    5) Three to four months later, Leading Edge Administrators terminated their agreement with

8    Veritas completely out of the blue. (Ex. 4 and 5). Defendant has not put anything forward to

9    suggest any other reason for the contract termination, and on a summary judgment standard, the

10   uncontroverted evidence offered combined with the summary judgment deference Veritas

11   receives, demonstrates the motion should be denied.

12           The damages related to Veritas S.O.S fees and payroll/labor costs are discussed in the next

13   section.

14        *ii.  Damages pertaining to Plaintiff's Second Cause of Action.*

15       At her deposition testimony, Defendant was asked:

16       Q. Let me ask you the question in a different way. What is the exact entity name of
         HC Consulting company? Is it LLC?
17       A. HC Consulting, LLC.
         Q. What would happen if somebody took over the registration for that business?
18       A. Well, I guess we would have to rename our company, but we also wouldn't let our
         licensure lapse, so.
19       (Deposition of HS. 74, 16-24)

20           Defendant herself appears to understand the concept her brief doesn't. If a company wants

21   to maintain its limited liability, if it wants to remain a party to the previous contracts it entered

22   into, if it wants to market and trademark and do all of the things a business needs to do to earn

23   revenue in a marketplace, it needs to operate under a consistent and identifiable name.

1       To be clear, plaintiff owns its mistake in letting its S.O.S. registration lapse.  However, a

2   company is entitled to reinstate an administrative dissolution, and this happens so often that the

3   LLC statute provides the following protection to companies in this event:

4       1)      A limited liability company that the Secretary of State administratively
        dissolved under ORS 63.651 (Procedure) may apply to the Secretary of State for
5       reinstatement within five years from the date of dissolution. The application must:
        …
6       3)When effective, the reinstatement relates back and takes effect as of the
        effective date of the administrative dissolution and the limited liability company
7       resumes carrying on the limited liability company's business as if the administrative
        dissolution had never occurred.
8       ORS 63.651 (1) and (3).

9   Plaintiff had the option and right to reinstate its registration, and it would have been as if nothing

10  happened.  However, Defendant and her co-conspirator intervened for nefarious purposes as

11  established above with the various smoking gun admissions from Defendant's deposition

12  testimony.  This act put Plaintiff in the position that Defendant says would force her to rename her

13  company.

14      The declaration of Shane Barnes establishes two areas of damages that the jury could

15  determine were causally linked to her unquestionably improper conduct.  First, the extra re-

16  registration charges incurred with making multiple filings with the S.O.S.   Second, the

17  labor/payroll hours of Veritas that were incurred in working with and explaining the situation to

18  clients, calling the S.O.S. reconstituting contracts and other necessary and proper business efforts

19  to resolve the issue.

20      Defendant knew about how her actins forced this labor on Veritas.  In her deposition

21  testimony, Defendant spoke about Veritas employee Eric Read had called one of her friends, who

22  was a customer of Veritas.  Bates Schiappacasse 52 was in front of Defendant, which was a text

23

1   she sent that read, "HAHAHAHA Eric Read just called my friend and wants to have Equitas name

2   removed from the contract and have Veritas Allied added."

3       Q. Okay. Okay. And then you say: Eric Reed just called my friend and wants to have the
Equitas name removed from the contract and have Veritas Allies added.

4       Who is Eric Reed?
A. I don't know.

5       Q. What was he talking about?
A. Obviously he was talking about a contract. I don't even know who I was talking to or

6   what friend I'm even -- even referring to. I just thought it was funny, since Veritas doesn't
own that name anymore, that they would want to change contracts to put them in their

7   name.
Q. Do you think that your message here in the middle of page 52 is about Mr. Vizzini?

8   A. I don't know.
Q. So you -- you have the Equitas --

9   A. I mean, when I say Veritas Allies, I assume it's about David Vizzini, yeah.
Q. It also says Equitas, which is another one of the companies. Right?

10   A. Yes.
Q. And you're telling me you don't know who the friend is or Eric Reed?

11   A. I don't know who -- what friend they're talking about. I don't know what friend I'm
talking about, so I don't know anything -- I don't -- I can't remember that. Eric, I don't

12   recall ever meeting an Eric Reed.
(HS Depo, 174, 22-25 to 175, 1-25)

13

14       Defendant is well connected, and was getting live reports from colleagues and industry

15   friends. The "HAHAH" in the text message tells the story of how Defendant was enjoying hearing

16   about Veritas Allies staff squirming and working to do damage control from hers and Ms. Free's

17   sabotage. She knew it was wrong, which is why she denies knowing Eric Read, or who her friend

18   is.

19       To conclude the section, it must be noted that Defendant has offered virtually zero evidence

20   to support whatever her position might be. I guess we will find that out in her reply brief, but if

21   new evidence is raised for the first time, as it should have been in its motion, Plaintiff reserves the

22   right to supplement.

23   ///

1

2      IV.      CONCLUSION

3          Defendant aimed squarely at Veritas and used Oregon contacts and resources to hit her

4   mark.  The damages show she was successful, which is the basis for the present suit, and thus the

5   motion should be denied so that Veritas can prove its claims at trial.

6

7

8   Dated this 5th day of April 2023

9                                                     By:  /s/ Grant T. Engrav
                                                      Grant T. Engrav, OSB No. 133517
10                                                    Of Attorney for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

1

2

**<u>CERTIFICATE OF SERVICE</u>**

3

I hereby certify that on April 5th, 2023, I served the preceding **PLAINTIFF'S RESPONSE TO**

4   **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on:

5          Philip Nelson, OSB No. 013650
           phil@slindenelson.com

6          Keith A. Pitt, OSB No. 973725
           keith@slindenelson.com

7

8        ____By mailing a true and correct copy thereof by U.S. Postal Service, ordinary first-class mail, addressed to each attorney's last known address and depositing in the U.S. mail at Portland,

9   Oregon on the date set forth above;

10       ____By mailing a true and correct copy thereof by U.S. Postal Service, certified mail, return receipt requested, addressed to each attorney's last-known address and depositing in the U.S.

11   mail at Portland, Oregon on the date set forth above;

12       ____By causing a true and correct copy thereof to be hand-delivered to the above-mentioned attorney's last known office address on the date set forth above;

13

        ____By sending a true and correct copy thereof by overnight courier, addressed to each attorney's

14   last known office address on the date set forth above;

15       ____By faxing a true and correct copy thereof to each attorney at each attorney's last known facsimile number on the date set forth above.  At the time of service the attorney maintained a

16   facsimile device at the attorney's office and the device was working at the time of service. Attached to this Certificate of Service is a printed confirmation of receipt of the message

17   generated by my office's facsimile transmitting machine.

18       X   By emailing a true and correct copy thereof to each attorney at each attorney's email address. Prior to service, the attorney's had agreed in writing to accept service via email.

19

20   Dated this 5th day of April 2023.

21                      **ENGRAV LAW OFFICE, LLP**

22                      By: /s/ Grant T. Engrav
                      Grant T. Engrav, OSB No. 133517

23                      Of Attorney for Plaintiff

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23